UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | ) | Civil Action No.: 2:10-cv-00955 |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| MERENDON MINING (NEVADA) INC, | ) | |
| LARRY LEE ADAIR, MILOWE ALLEN BROST | ) | |
| a/k/a MILOW BROST, M.B. GONNE or | ) | |
| PHILLIP K. COLLINS, WARD K. CAPSTICK, | ) | COMPLAINT |
| BRADLEY DEAN REGIER, GARY ALLEN | ) | |
| SORENSON a/k/a DON GREY FOX, | ) | |
| MARTIN M. WERNER, SYNDICATED GOLD | ) | |
| DEPOSITORY INC, now known as BAHAMAS | ) | |
| RESOURCES ALLIANCE LTD., MERENDON | ) | |
| MINING CORP. LTD., INSTITUTE FOR | ) | |
| FINANCIAL LEARNING GROUP OF | ) | |
| COMPANIES, INC., | ) | |
| | ) | |
| | ) | |
| Defendants | ) | |
| | ) | |
| THELMA SORENSON, | ) | |
| LAURA SORENSON, | ) | |
| | ) | |
| Relief Defendants. | ) | |
| | ) | |

The Securities and Exchange Commission ("SEC") alleges the following facts in

support of its Complaint:

Complaint                                    [Page 1]                    Securities and Exchange Commission
                                                                         1801 California St., Ste. 1500
                                                                         Denver, CO 80202
                                                                         (303) 844-1000

1.      From at least 1999 to 2008, the Defendants perpetrated a $300 million Ponzi scheme that victimized over 3,000 investors in the United States and Canada.  The Defendants executed the scheme through a multi-level marketing organization and operated through a labyrinth of companies and bank accounts which were designed to hide their misconduct from investors and law enforcement.  The Defendants eventually used more than eighty entities to issue securities to investors, provide "dog and pony" shows to investors, and to disguise the movement of investor funds among more than eighty bank accounts, located in United States, Canada, Honduras, Ecuador, Peru, Venezuela, Panama, the Bahamas, Belize, Bermuda, Malaysia, and Portugal.  To further hide their involvement in the scheme, several of the defendants acted under the guise of several personal aliases in forming and managing this cadre of companies.

2.      The primary architects and beneficiaries of the scheme were Defendants Gary Allen Sorenson ("Sorenson") and Milowe Brost ("Brost").

3.      Defendants commenced the scheme with the offer and sale of promissory notes issued by Defendant Syndicated Gold Depository, Inc. ("SGD"), an entity formed in 1999 by Sorenson and Brost.

4.      Sorenson and Brost told investors that SGD was an independent company that pooled investors' funds and loaned the funds to Defendant Merendon Mining Corp. Ltd. ("Merendon Int'l") to purchase gold concentrate to process in its refinery in Honduras.  Defendants falsely represented that investors' funds were secured by Merendon Int'l's above-ground gold or cash deposits.  In fact, Sorenson and Brost were the undisclosed owners of SGD, and contrary to their representations, Merendon Int'l did not have sufficient above-ground gold, cash deposits or revenue from operations to pay interest owed to SGD under the loan agreement.

5.      Instead the Defendants used incoming investors' funds to pay obligations to existing investors.  In classic Ponzi scheme style, after paying investors' purported returns, the Defendants diverted investors' funds to their personal benefit, using tens of millions of dollars to purchase and outfit luxury resorts, extravagant homes, and purchase recreational vehicles.

Complaint                                    [Page 2]                    Securities and Exchange Commission
                                                                                           1801 California St., Ste. 1500
                                                                                           Denver, CO 80202
                                                                                           (303) 844-1000

6.     Eventually, the scheme expanded to include the offer and sale of securities in various other companies which one or more of the Defendants or their associates secretly controlled.

7.     In furtherance of the scheme, the Defendants offered and sold the securities of what they represented to investors was a "selected group of companies" which included, but is not limited to the following: Quatro Communications Corporation ("Quatro"), Rapid Express Corporation ("Rapid Express"), Arbour Energy Inc. ("Arbour Energy"), Strategic Metals Corporation ("Strategic Metals"), Merendon Mining (Nevada) Inc. ("Merendon Nevada"), and Bearstone Capital Management Inc.  The defendants used funds received from investors in these companies to pay purported returns to investors.

8.     Defendants' scheme revolved around several core misrepresentations and omissions:

a)   Investors were promised extraordinary annual returns, 18% to 100%, that were purportedly paid out of the revenues of profitable businesses.

b)   Investors were told their funds were fully collateralized and used for specific business purposes.

c)   Investors were told that the various companies that marketed the investment, performed due diligence, and conducted audits of companies which issued securities to investors were unrelated to each other were operating at arms length, which  would provide security to their investment by serving as a system of checks and balances.

9.     In furtherance of the scheme, Brost created and controlled several successive marketing organizations, Capital Alternatives Inc. ("Capital Alternatives"), its successor the Defendant Institute For Financial Learning Group of Companies, Inc. ("IFFL") and Hav-Loc Private Wealth Partners Inc. ("Hav-Loc") to offer and sell the securities of various companies to investors. Brost recruited and trained salespersons whom he called "Structurists" and whose role in the scheme were to bring in new investors under the multi-level marketing model.  The

Structurists acted under Brost's direction in offering and selling the securities of SGD and the selected group of companies.

10.     Defendant Ward K. Capstick ("Capstick") became a Structurist in 2001.  He offered and sold the securities of the companies discussed in this Complaint.  In December 2003, Brost appointed Capstick as IFFL's regional executive for the Western United States.  Some of the Structurists were recruited by Capstick and acted under his direction in offering and selling the securities of SGD and other companies.  Capstick was also an officer and director of Merendon Nevada.

11.     Defendant Larry Lee Adair ("Adair"), who is a Florida attorney, served as the president of SGD from approximately December 2001 through December 2003, but continued to act in furtherance of the scheme through at least March 2007.  Adair, as the president of SGD, offered and sold its securities, and made false and misleading statements to Structurists and investors about, among other things, the rate of return paid by SGD securities, the use of investors' funds, the security of the investment, and independence of the various companies.  At various times throughout the period from December 2001 through March 2007, Adair used one or more of his attorney trust accounts to receive funds from investors in SGD or the other selected companies, pay purported returns back to investors, and pay funds for the benefit of the defendants.

12.     Defendant Bradley Dean Regier ("Regier") became the accountant and book-keeper for Capital Alternatives in or about 2001 and for IFFL in 2003, as well as for other companies whose securities Brost and the Structurists sold.  Under Brost's direction, Regier managed Expedia Logistics, Inc. ("Expedia Logistics"), which coordinated the processing of IFFL investor information.  In furtherance of the scheme, among other things, he created the false and misleading offering materials for Rapid Express, and served as an officer or director for Strategic Metals and Merendon Nevada.  He directed the transfer of investors' funds received by Rapid Express, Strategic Metals or Merendon Nevada through the sales of securities to the bank accounts of Adair, Werner, Merendon Int'l or other entities controlled by one or more of the defendants for further use in the scheme.

13.     Defendant Martin M. Werner ("Werner"), who is a Florida attorney, became corporate counsel for IFFL in or about November 2003 and provided advice about the business operations of Defendant Merendon Nevada.  In or about April 2007, he became the president of SGD, and offered and sold the securities of SGD, and made false and misleading statements to Structurists and investors about, among other things, the rate of return paid by SGD securities, the use of investors' funds, the security of the investment, and independence of the various companies.  Between approximately April 2007 and March, 2008, Werner and SGD offered and sold approximately $50 million of SGD securities.  Werner used his attorney trust accounts to receive funds from investors in SGD or the other selected companies, pay purported returns back to investors, and pay funds for the benefit of the defendants.

14.     In late 2007 to early 2008, the scheme collapsed as the Defendants were no longer able to bring in enough fresh capital to meet their outstanding obligations to investors.  As a result, most of the more than 3,000 investors solicited into the scheme never received the promised interest or return of their principal.  Investors, many of whom were elderly, have seen their homes go into foreclosure and have been forced to postpone or reverse retirement decisions as a result of their losses through the Defendants' investment scheme.

15.     Through this scheme, the Defendants violated the antifraud, securities registration, and broker-dealer registration provisions of the federal securities laws.  Unless enjoined by this Court, Defendants will continue to engage in conduct that violates the securities laws.  Accordingly, the Commission seeks an order finding the defendants violated the federal securities laws, enjoining the defendants from further violations, requiring the defendants to prepare an accounting, requiring disgorgement of ill-gotten gains, ordering civil money penalties, barring the defendants from serving as officers or directors of public companies, ordering the relief defendants to disgorge ill-gotten gains that they received, and granting other equitable relief.

### JURISDICTION AND VENUE

16.   This Court has jurisdiction over this action pursuant to Sections 20(b), 20(d), and 22(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §§ 77t(b), 77t(d), 77v (a)] and

Sections 21(d), 21(e) and 27 of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §§ 78u(d), (e) and 78aa].

17.   Each defendant, directly or indirectly, made use of the means or instrumentalities of interstate commerce, of the mails, or of the means and instruments of transportation or communication in interstate commerce in connection with transactions, acts, practices and courses of business alleged herein.

18.   Venue is proper in this district pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and Section 27 of the Exchange Act [15 U.S.C. § 78aa].   Certain of the acts, practices, and courses of conduct constituting the violations of law alleged herein occurred within this judicial district.   Defendant Capstick resides in this district and was one of the participants in the scheme to defraud investors.

## DEFENDANTS AND RELIEF DEFENDANTS

19.   **Defendant Merendon Mining (Nevada) Inc.** ("Merendon Nevada") is a Nevada corporation formed in December 30, 2002, and is now in default for failing to file corporate filings with Nevada.   Merendon Nevada acquired various mining properties through its wholly owned subsidiaries: Merendon Mining (Colorado) Inc., which is a Colorado corporation that had its principal place of business in Broomfield, Colorado; Merendon Mining (Arizona), Inc. and Merendon Mining (California), Inc., which are Nevada corporations that had principal places of business in Las Vegas, Nevada.   The parent company and subsidiaries are referred to jointly in this complaint as "Merendon Nevada."   Merendon Nevada offered and sold more than $140 million in securities between 2002 and 2007 in furtherance of the Ponzi scheme. Investor victims sent their money to Merendon Nevada through a Colorado bank account maintained by its Colorado subsidiary.   Merendon Nevada is the subject of an involuntary bankruptcy proceeding in the U. S. Bankruptcy Court for the Southern District of Florida (Miami) case number 09-11958-AJC (filed 2/4/09).

20.   **Defendant Syndicated Gold Depository S.A.** ("SGD") is a Bahamian registered corporation formed in August 1999 by Defendants Gary Allen Sorenson ("Sorenson") and Milowe Brost ("Brost") which used a mailing address in Miami, Florida.  SGD issued securities

to investors as a part of the scheme.  In 2005, SGD formed a wholly-owned subsidiary called Base Metals Corporation.  In October 2007, SGD acquired control of all of the "International Investments" discussed in this Complaint.  From January 2000 to November 2007, SGD promised investors 18%-36% annual returns, usually packaged as bonus return to investors in Merendon Nevada or other related entities.  SGD changed its name to Bahama Resource Alliance Ltd. in or about May 2007.

21.   **Defendant Merendon Mining Corporation Ltd.** ("Merendon Int'l") was incorporated in Alberta, Canada on or about February 22, 1996, and later changed its name to Merendon Mining Corporation Ltd. on about May 9, 1996.  Merendon Int'l maintained its main office in Calgary, Alberta, Canada.  Upon information and belief, Merendon Int'l is now domiciled in Belize with its headquarters in Honduras.  Merendon Int'l owns, among other things, five wholly-owned subsidiaries which are Compania Merendon de Honduras S.A. de C.V. ("Merendon Honduras"), a Honduran corporation; Merendon de Venezuela C.A., a Venezuelan corporation; Merendon de Peru S.A., a Peruvian corporation; Merendon de Ecuador S.A., an Ecuadorian corporation and Merendon Jewellry S.A., a Honduran corporation.  Merendon Int'l through its subsidiary Merendon Honduras owns and operates a gold refining facility in Tegucigalpa, Honduras and several gold concessions, which are mining claims, in Honduras.  Merendon Int'l and its subsidiaries are referred to jointly in this complaint as "Merendon Int'l."

22.   **Defendant Institute for Financial Learning Group of Companies, Inc.** ("IFFL") is a Canadian corporation formed in Alberta, Canada in or about April 2003 and operated from offices in Calgary, Alberta.  It was the most prominent in a series of marketing organization created by Defendant Milowe Allen Brost that offered and sold securities of various companies to  investors.  At all times material to the complaint, Brost was the Chief Executive Officer of IFFL and he recruited and trained a team of salespersons called "Structurists" who were compensated by IFFL to offer and sell the various securities used in the scheme.  IFFL reported over 150 Structurist were touting its investment program in 2007.

Securities and Exchange Commission
1801 California St., Ste. 1500
Denver, CO 80202
(303) 844-1000

23. **Defendant Milowe Allen Brost**, age 56, is a Canadian citizen, who resides in Calgary, Alberta, Canada. Brost is also known by various aliases including Milo Brost, M.B. Gonne, and Phillip K. Collins. Brost formed and ran the IFFL and other related marketing companies, and was a director and shareholder of SGD. He was also a central member of the International Business Group ("IBG"), which was represented as a group of businessmen and businesses which purported to independently vet companies which offered securities to investors as a part of the scheme. Additionally, Brost was a shareholder, director and CEO of Merendon Nevada. Brost has been the subject of numerous regulatory actions by state and Canadian securities regulators and as of June 2010 was arrested by the Royal Canadian Mounted Police ("RCMP") and is out on bond awaiting trial in Alberta, Canada, in connection with fraudulent scheme outlined in this Complaint.

24. **Defendant Gary Allen Sorenson**, age 66, is a Canadian citizen, who currently resides in Calgary, Alberta, Canada, but from approximately 2000 through 2009, resided in Tegucigalpa, Honduras. Sorenson is also known by the alias of Don Grey Fox. Sorenson was a director, chief executive officer and indirectly the controlling shareholder of Defendant Merendon Mining Corp. Ltd. ("Merendon Int'l"), and was a shareholder and director of SGD. Sorenson was a central member of the IBG and participated in IBG meetings during which various Defendants discussed and implemented the scheme. Sorenson also held a beneficial interest in Merendon Nevada. As of June 2010, Sorenson was arrested by the RCMP and is out on bond awaiting trial in Alberta, Canada, in connection with the fraudulent scheme outlined in this Complaint.

25. **Defendant Bradley Dean Regier**, age 40, is a Canadian citizen who resides in Calgary, Alberta, Canada. Between 2001 and 2008, Regier was an accountant and bookkeeper for a Brost-created marketing entity which was the predecessor to IFFL, as well as for several of the companies whose securities Brost and the Structurists offered and sold to investors. He also managed Expedia Logistics, which coordinated the processing of IFFL investor information. Regier was a member of the IBG and participated in IBG meetings. Regier was also an officer and director of Merendon Nevada and oversaw the accounting for that entity.

26. **Defendant Ward K. Capstick**, age 44, is a Canadian citizen, who resides in Snohomish, Washington.  Capstick offered and sold the securities of the various companies discussed in this Complaint as a "Structurist" and "Regional Executive for the Western United States" with the IFFL and its predecessor.  Capstick was a member of the IBG and participated in its meetings.  Capstick was also an officer and director of Merendon Nevada.

27. **Defendant Larry Lee Adair**, age 62, resides in Fort Lauderdale, Florida.  He is an attorney licensed to practice law in Florida since approximately 1974.  Adair was the president of SGD from approximately December 2001 until at least December 2003, but continued to act as an agent of the company through at least 2005.  Adair was also a director of Defendant Merendon Int'l from February 2002 through at least March 2004.  Using his attorney trust account, Adair managed the flow of investors' funds at the direction of Defendant Sorenson from at least June of 2002 until March 2007.

28. **Defendant Martin M. Werner**, age 53, resides in Boca Raton, Florida. He is an attorney licensed to practice law in Florida since 1985.  Werner was the president of SGD from April 2007 through the present.  Werner was a member of the IBG and participated in IBG meetings in which the insiders discussed and implemented the scheme.  Werner was the president of Bearstone Capital Management Inc. ("Bearstone"), a company that sold securities as part of the scheme, from at least November 2007 to March 2008.

29. **Relief defendant Thelma Duron Sorenson** is the wife of Sorenson.  She currently resides in Calgary, Alberta, Canada, but from approximately 2000 through 2009, she resided in Tegucigalpa, Honduras.

30. **Relief defendant Laura Sorenson** is the adult daughter of Gary Sorenson and resides in Burbank, California.

## FACTS

### I.  Overview of the Scheme

31. Defendants commenced the scheme in 1999 with sales of promissory notes issued by SGD, and over time continuously expanded the group of companies whose securities were offered to investors.

Complaint [Page 9]

32.     The Defendants' scheme had three components:  the "Marketing Program," the "National Investments," and the "International Investments."  The purpose and effect of the scheme was to funnel investor funds ostensibly sent to numerous different entities into one bucket controlled by Sorenson and Brost.

**A. The Marketing Program**

33.     Brost was the head of a Marketing Program that operated under a successive series of names during the scheme and employed Structurists to sell securities to investors, starting with his formation of a marketing company called Capital Alternatives in 1999.   When the Saskatchewan Financial Services Commission issued a Cease Trading Order in 2002 against Capital Alternatives, Brost created a new marketing company called the IFFL.  In 2007, after the Alberta Securities Commission sanctioned IFFL, Brost's team of marketers began selling scheme securities under the name of Hav-Loc.  Unless particular circumstances dictate otherwise, these successive Brost marketing entities which operated during the scheme are referred to herein collectively as the "IFFL."  Between 1999 and 2008, the IFFL presented itself as an investor education company that taught investing strategies which were ostensibly concentrated on "restructuring" investors' underperforming assets.

34.   Brost recruited and trained hundreds of individuals to become Structurists for IFFL under a multi-level marketing model in which they were compensated for bringing in new investors and new salespersons.  In addition to making direct presentations to prospective investors, throughout the scheme Brost held bi-annual and ad-hoc meetings with his team of Structurists to train them how to sell the IFFL investment program.  In furtherance of the scheme, Defendant Sorenson gave presentations to the Structurists at the bi-annual meetings concerning the investment products to be offered to investors.  In December 2003, Brost appointed Capstick as a regional executive and head Structurist for the Western United States.  Thereafter, Capstick also recruited, trained and managed some of the Structurists.

35.     The IFFL's primary means of bringing in new investors was word-of-mouth.  Brost and the Structurists held group meetings with potential investors in hotels, banks and private homes.  The most extravagant IFFL meeting was a retreat in August 2006, for more

than 1,000 investors at a resort in the Bahamas that IFFL paid for with investors' funds – a gathering Brost credited with bringing in $25 million in new investor funds.  At the group meetings, investors were told about a purported investment strategy of "restructuring" purportedly under-performing assets, such as 401(k)s and untapped home equity, into high-return, low-risk off-shore investment opportunities.

36.     Investors who attended group meetings and expressed an interest in restructuring their assets were invited to private, one-on-one meetings with an IFFL Structurist.  Consistent with Brost's training and direction, Structurists told investors in those meetings that the way to access tax-deferred, high growth off-shore investments was to first purchase a security from an available IFFL portfolio of on-shore companies, or "National Investments," that would offer relatively low-yield securities.  The IFFL Structurists told investors that once they joined the IFFL and purchased a security from one of the National Investments, they would automatically receive an investment account reflecting interests in several off-shore companies ("International Investments") worth 78% - 85% of their principal invested with the National Investment.  The Structurists told investors that these International Investments would generate very high annual returns – from 18% to 100%.  Investors were also told that their International Investments would grow tax-free off-shore and that they would only incur tax obligations when they repatriated their funds.

37.     The IFFL Structurists further claimed that the National Investments and International Investments had been independently vetted through due diligence conducted by an entity called the "International Business Group" ("IBG"), and that the integrity of the investments would be constantly monitored.  Brost, Capstick and the Structurists told investors that the IBG was an independent group of successful businessmen that researched international investment opportunities, and used its experience, past successes and due diligence to identify and screen offshore investments which the IFFL then recommended to investors.  In fact, the IBG was just a name the Defendants used to describe themselves when they held meetings to discuss their ongoing fraudulent scheme.

38.     Investors were told that their entitlement to participate in the International Investments was at all times contingent upon their retention of an investment of principal in the National Investments.  The Defendants used this device to keep nervous investors in the scheme as it began to unravel in 2007.

39.     IFFL charged investors an initial fee of $1,200 to $1,600 to join the organization before they could learn about the specific investment products, as well as an annual renewal fee.

40.  Brost received 6%-10% commission on all funds raised by IFFL Structurists. Additional investor funds were paid as commissions to Structurists based on the amounts of funds they raised.  This fact was not disclosed to at least some investors.

## B.  The National Investment

41.     The National Investment, which IFFL, Brost, Capstick and the Structurists acting under their direction offered and sold to investors, was typically a North American business that was represented to investors to be a successful and profitable company which offered securities with a purported annual return of 5% to 12%.

42.     Between 2000 and 2008, the Defendants used the Marketing Plan to sell more than $300 million of securities through eighteen companies identified as one of the National Investments.  The most prominent of them were as follows:

    a)  Between October 2001, and November 2003, Defendants offered and sold approximately $42,827,734 of the securities of Quatro Communications Inc. ("Quatro").

    b)  Between December 2003, and November 2004, Defendants offered and sold approximately $39,665,687 of the securities of Rapid Express Inc. ("Rapid Express").

    c)  Between July 2004, and December 2005, Defendants offered and sold approximately $47,338,084 of the securities of Arbour Energy, Inc. ("Arbour Energy").

d)  Between July 2004 through August 2005, Defendants offered and sold approximately $36,400,000 of the securities of Strategic Metals Corp. ("Strategic").

e)  Between October 2002 through November 2007, Defendants offered and sold approximately $140,000,000 of the securities of Merendon Nevada.

f)  Between 2007 and 2008, Defendants offered and sold $3 million of the securities of a limited partnership related to Bearstone.

43.  For each of the National Investments, the Defendants misrepresented or concealed from investors the following material facts that:

a)  Brost, Sorenson or their close associates controlled the companies;

b)  While some companies had sufficient operations to present "dog and pony" shows to investors, none were profitable; and

c)  The money investors paid to purchase the securities of the National Investments was used to pay purported returns to IFFL investors and to enrich the defendants.

## C. The International Investment

44.  For investors, the National Investment offered by IFFL was merely a gateway to the International Investment, where their purportedly exceptional returns were to be made. IFFL, Brost, Capstick and the Structurists continuously represented that IBG was using its experience, past successes and due diligence to identify offshore investments.  Brost, Capstick and the Structurists represented that investors would receive 18%-100% annual returns from these low-risk, highly-collateralized International Investments.

45.  IFFL, Brost, Capstick, and Structurists presented an evolving group of three or four International Investment companies to investors, which included the securities of SGD.

46.  As with the National Investments, the Defendants deceived investors by failing to disclose the following critical facts that:

a)  Brost and Sorenson were members of, and controlled, the IBG,

Securities and Exchange Commission
1801 California St., Ste. 1500
Denver, CO 80202
(303) 844-1000

b)  They or their associates controlled each of the International Investment companies that the IBG claimed to have identified through independent due diligence;

c)  None of the International Investment companies was profitable; and

d)  None of the International Investment companies generated revenues sufficient to pay the promised 18%-100% annual returns.

## II.    Implementation of the Scheme

### A.  Sales of National and International Investments in Furtherance of the Scheme

47.     Brost, Sorenson, Regier, Capstick, Adair and Werner formed the inner circle of conspirators with primary responsibility for conceiving and executing the scheme.

48.     Throughout the scheme, the Defendants used succession of companies to perpetrate their fraud. As one company attracted attention from regulators or otherwise encountered problems, the Defendants formed a new one and issued new securities in order to continue the scheme.  The most prominent offerings were through SGD, Quatro, Rapid Express, Arbour Energy, Strategic Metals, Merendon Nevada and Bearstone.  Defendants made numerous knowing, material misrepresentations and omissions relating to these offerings.

### 1.    Syndicated Gold Depository Inc.

49.     SGD was the primary International Investment presented to investors as part of the IFFL investment program.  IFFL, Brost, Capstick, Regier, Sorenson, Adair, Werner and Merendon Int'l engaged in a scheme to defraud investors in connection with the offer and sale of the securities of SGD.

50.     In furtherance of the scheme, IFFL, Brost, Capstick, Regier, Sorenson, Adair, Werner and Merendon Int'l used SGD as a device to raise money for Merendon Int'l's operations, and to secretly enrich themselves.

51.     In furtherance of the scheme, Sorenson, Brost, and another Canadian citizen, Owen Hoffman, caused SGD to be incorporated in the Bahamas in 1999, and became its three shareholders.  Sorenson, Brost, and Hoffman created SGD with the business purpose of selling securities to investors in the form of promissory notes, pooling investors' funds, and the

purportedly loaning those funds to Merendon Int'l to purchase gold concentrate for Merendon Int'l to process in its refinery in Honduras.  Sorenson and Brost were involved in managing and controlling SGD's business affairs.

52.     On or about September 17, 1999, Hoffman, on behalf of SGD, and Sorenson, on behalf of Merendon Int'l and Merendon Honduras, entered into a joint venture agreement. SGD agreed to provide funds to Merendon Int'l to finance the purchase of unrefined gold to process at the refinery owned by Merendon Honduras in Honduras.  In return SGD was to receive 25% of the joint venture profits after costs, taxes and a refining fee, and Merendon Int'l was to pay SGD an amount equal to 4% per month on the funds provided by SGD.  The agreement provided that representatives of SGD and Merendon Int'l were to sign off on monthly audits of gold purchased, refined, and sold, and of the amounts of funds owed to SGD. The agreement was later revised on November 29, 1999 and January 25, 2000.

53.     In August 1999, Hoffman drafted a brochure titled "Syndicated Gold Depository Program" concerning SGD's investment contracts.  Sorenson also reviewed the statements in the brochure and edited them.  The brochure contained many of the misrepresentations about SGD and Merendon Int'l that Sorenson and the other Defendants made to investors throughout the Ponzi scheme.

54.     From on or about August 1999 and continuing through November 2007, SGD, IFFL, Brost, Capstick, Sorenson, Adair, and Werner directly or indirectly offered and sold securities of SGD to one or more of the investors who reside in the Western District of Washington or other places within the United States and Canada.  The contracts provided that SGD borrowed the funds from investors in exchange for monthly interest rates ranging from 1.5% to 3.5%.  SGD represented that it loaned the investors' funds to Merendon Int'l for the sole purpose of purchasing gold concentrate to process in its refinery.

55.     The defendants directly or indirectly sent SGD offering materials, the investment contracts, and monthly account statements reporting the monthly interest purportedly earned to investors through the mails or by means of the Internet.

56.     Between August 1999 and November 2007, SGD, IFFL, Brost, Sorenson, Merendon Int'l, Capstick (during the time period from December 2001 and November 2007), Adair (during the time period from January 2002 through 2005), and Werner (during the time period from April 2007 through November 2007) made false and misleading statements and omissions of material facts in the offering materials and in verbal statements to investors including, among other things, that:

   a)   The SGD program offered rates of return ranging from 3.5% to 1.5% per month;

   b)   Investors' funds were being used to purchase raw gold or gold concentrates to be refined in Merendon Int'l's refinery in Honduras;

   c)   The investors' funds were collateralized by raw gold, finished gold, and cash on deposit of Merendon Int'l at a ratio of 1 to 1 or greater;

   d)   SGD conducted audits of Merendon Int'l's production of finished gold, raw gold still in the work in progress stage, and cash outstanding;

   e)   Merendon Int'l was profitable and paid rates of return of 18% to 36% which would be repaid from profits generated by the refinery;

   f)   Merendon Int'l uses the proceeds from the sale of its gold to pay SGD its appropriate interest;

   g)   SGD paid returns to investors out of profits generated by Merendon Int'l's refinery when in fact those returns were paid out of investors' funds; and

   h)   Loans by SGD to Merendon Int'l were arms-length transactions between independent parties.

57.     The statements were false and misleading because SGD did not have sufficient income to pay rates of return of 3.5% to 1.5 % per month.  Investors' funds were used for purposes other than the purchase of gold concentrate for processing in Merendon Int'l's refinery. The investors' funds were not collateralized by raw gold, finished gold or cash on deposit at a ratio of 1 to 1 or greater.   SGD did not conduct audits of the gold produced and the cash outstanding of Merendon Int'l.  Merendon Int'l was not profitable.  Merendon Int'l did not have sufficient proceeds from the sale of gold to pay SGD the interest that was due.  The

defendants failed to disclose that the purported returns SGD paid to investors were in fact from the funds paid to SGD by other investors rather than from the operations of Merendon Int'l. The defendants failed to disclose that Sorenson, who was an officer and director of Merendon Int'l, and Brost, who was the chief executive officer and owner of Capital Alternatives and IFFL, beneficially owned and controlled SGD.

58.    In furtherance of the scheme, IFFL, Brost, Capstick and Structurists instructed investors to transfer funds to the accounts of third parties, which then transferred the funds to the trust accounts of Adair or Werner for the benefit of SGD.

59.    In furtherance of the scheme, Adair and Werner transferred SGD investors' funds to Merendon Int'l or other entities for the benefit of one or more of the Defendants.

60.    In furtherance of the scheme, Merendon Int'l and Sorenson received the investors' funds from SGD without providing the security represented as above ground gold or cash deposits at a ratio of 1 to 1 or greater; or providing interest payments to SGD from Merendon Int'l's business operations. Instead, Merendon Int'l paid purported interest from the investors' funds it received from SGD.

61.    On October 24, 2000, the Alberta Securities Commission entered an order against Sorenson, Merendon Int'l, and others requiring among other things that Sorenson withdraw as a director of any issuer of securities and to cease trading securities for two years.

62.    On or about August 3, 2001, Brost, Sorenson and Hoffman met in Miami, Florida for a stockholders and directors meeting of SGD.  They discussed that SGD's liability for principal and interest to investors was approximately $16,000,000 but that the cash and gold of Merendon Int'l was valued only at $3,032,480.  Although they knew that Merendon Int'l did not have sufficient collateral to secure the investments made by SGD, they agreed that Brost was to instruct the Structurists to say that the SGD investment was a low risk because there was a 1 to 1 ratio of collateral to investment.  They also discussed that Merendon Int'l had a capital requirement of $5,000,000 by December 31, 2001.  Sorenson proposed that the Structurists who raised $2.5 million be paid a bonus of 1.5%, and that they receive another bonus after raising an additional $2.5 million.

63.     During the August 3, 2001 meeting, Brost, Sorenson and Hoffman also agreed to conceal their ownership of SGD by transferring their shares of SGD to three corporate entities.  They backdated the agreement to January 25, 2000.  They further agreed that any notices required under SGD shareholders' agreement were to be sent to Adair in Florida.

64.     As part of the scheme to sell SGD securities, Brost conducted at least four meetings with investors in South Carolina and North Carolina between 2001 and 2003, at which he offered the securities of SGD for sale.  Brost also met with prospective investors in the Seattle, Washington area.  Among other things, Brost omitted to disclose the following:

a)  That he was a shareholder of SGD.

b)  That he had taken steps to conceal his ownership of SGD, including appointing nominee shareholders and having others hold shares in trust for him.

c)  That Sorenson was a shareholder of SGD.

d)  That Sorenson had taken steps to conceal his ownership of SGD, including appointing nominee shareholders.

e)  That he controlled the entities presented in National and International Investment Program.

f)  That certain individuals who had discovered the companies through due diligence were involved in forming SGD and the other entities.

65.     In October 2002, during an investor tour in Honduras, Brost told investors the 34% returns from SGD were being generated by the operations of the Merendon Int'l refinery.

66.     As part of the scheme to sell SGD securities, Sorenson, both individually and as the CEO of Merendon Int'l, made statements similar to those contained in the offering materials when he met with prospective investors, some of whom travelled from the Western District of Washington to see the operation of the refinery in Honduras or to attend Structurists conferences held in Canada.  Among other things, Sorenson told prospective investors that SGD loaned money to Merendon Int'l to fund its operations and that Merendon Int'l had pledged all of its assets as collateral for the loans received from SGD.  Sorenson made false and misleading statements of material fact including among other things:

a) On January 7, 2002, Sorenson met with potential and existing SGD investors.  In that meeting, he falsely stated that SGD and Merendon Int'l were arms length companies.  He falsely stated that Merendon paid SGD investors out of its profits from its refinery.  He falsely stated Merendon earned enough money to pay the SGD investors' monthly interest in three to four days of refining.  Sorenson also falsely claimed that SGD investments were secured by above-ground gold.

b) In October 2002, Sorenson met with additional SGD investors.  At that meeting, Sorenson falsely stated that the Merendon Int'l refinery was profitable and that the SGD funds were making him wealthy through the operations of the refinery.  Additionally, Sorenson falsely stated that the refinery was in active production and was producing substantial amounts of refined gold.

c) On September 11, 2003, Sorenson met with group of potential and existing IFFL investors.  Sorenson falsely stated that he had no control over SGD.

d) At an IFFL Structurist conference in Canmore, Canada in December 2003, Sorenson told the Structurists and IFFL members, "Why do we recommend SGD as an investing fund?  The answer should be because it is 100% secure."  Sorenson also stated the SGD fund will be $150,000,000 by December 31, 2005.

e) In approximately December 2004, Sorenson met with a group of SGD investors.  He responded to investor questions about who had negotiated the Merendon Int'l and SGD Master Agreement by concealing his and Brost's involvement with SGD.  Sorenson falsely stated that Brost was not involved in the process.  Sorenson stated that he negotiated on behalf of Merendon Int'l and the "SGD syndicate" negotiated on behalf of SGD.

f) On February 25, 2005, Sorenson met with SGD investors in Honduras.  He denied paying investor monthly payments with new or other investor money.

67.    In or about December 2001, Adair was named a director and president of SGD. As part of the scheme to sell SGD securities, Adair made false and misleading statements including among other things the following:

a)    In a July 2002 newsletter to investors, Adair said "My duties require that I spend much of my time in Honduras addressing the day to day operations on behalf of SGD clients. . . . The raw gold is then refined at the facilities of Merendon . . . while always under the supervision of SGD's onsite agent, whose sole purpose is to monitor and look after the interest of SGD and its clients. At the end of each day's production, an audit of the day's output is taken of both finished and raw gold still in progress."

b)    In January 2003, Adair told investors that he "personally does the vault tote audit" and that, on five days notice SGD could take over Merendon Int'l's assets, if there was a default.

c)    On January 1, 2005, an investor telephoned Adair and discussed his concerns about the security of his SGD investment. Adair assured the investor that there was no threat to his SGD investment. Adair stated the investment was 10 times more secure than when the investor first visited Honduras in 2003. On March 4, 2005, Adair had a recorded conversation with Hoffman in which Adair stated that SGD investors would "blow their brains out" if they knew the truth about the investment because Merendon Int'l had no assets in production and no income. On March 8, 2005, Adair spoke again with the same investor who had called him on January 1, 2005, and assured him that his investment was secured by Merendon Int'l, and that it was 10 times larger and more secure than before.

68.    The statements made in the offering materials or verbally by Brost, Sorenson and Adair were false and misleading. Throughout the time period at issue, Sorenson, Brost and Adair knew or were reckless in not knowing that Merendon Int'l was not producing sufficient revenue from the sales of gold to pay 4% interest provided for in the joint venture agreement. They also knew that Merendon Int'l did not own sufficient finished gold, cash on deposit, and

raw gold inventories to provide collateral to repay the funds that investors had invested with SGD to provide as loans to Merendon Int'l.  They knew that SGD did not perform extensive daily, weekly, or monthly audits of the plant's production and output of finished gold.  They each knew that Sorenson and Brost were the beneficial owners of SGD.

69.    On or about February 22, 2002, Merendon Int'l held a board of directors meeting which was attended by Sorenson, Brost, Hoffman and Adair.  Brost gave a presentation on funds being raised through securities sales by SGD, which were to be paid as funding to Merendon Int'l under the joint venture agreement.  Adair and other directors voted to accept the consolidated financial statements of Merendon Int'l dated November 30, 2001 and May 31, 2001.  The financial statements showed that for the period ending November 30, 2001, Merendon Int'l had gross margin of $178,674 from sales of gold after deducting expenses, inventory of gold of $319,762, and cash of $1,232,122.  Sorenson, Brost and Adair knew or were reckless in not knowing that as of January 1, 2002, Merendon Int'l owed SGD approximately $24,329,114 in principal and interest.  Sorenson, Brost and Adair also knew or were reckless in not knowing from this information that Merendon Int'l did not have the ability to pay SGD the 4% monthly interest promised in the joint venture agreement. By at least February 2002, Sorenson, Brost and Adair knew from their participation in Merendon Int'l's board meeting that Merendon Int'l did not have the sufficient above-ground gold or cash to collateralize SGD's loans to it.

70.    Merendon Int'l's financial statements show that from at least 2000 to 2007, it was not profitable and did not generate revenue sufficient to repay the principal and interest it owed to SGD.  Its financial statements show that it did not possess above-ground inventories of gold or cash sufficient to collateralize the SGD debt at a ratio of 1 to 1 or greater.  Sorenson, as a beneficial owner of Merendon Int'l, knew at all relevant times the financial condition of Merendon Int'l.

71.    The knowledge Sorenson, Brost and Adair obtained at the meeting of the board of directors for Merendon Int'l or through their access to Merendon Int'l financial statements is

attributed to SGD, because Sorenson, Brost and Adair were also officers or directors of SGD. Brost's knowledge is attributed to IFFL for whom he also served as a director and CEO.

72.     In spite of their knowledge of the financial situation of Merendon Int'l and SGD, Brost, Sorenson and Adair continued their scheme to offer and sell securities of SGD, with the intention of transferring additional funds obtained from investors in SGD to Merendon Int'l.

73.     Although Adair resigned his appointment as the president and director of SGD on or about January 5, 2004, he continued to act on behalf of SGD and communicate with investors through at least 2005.  In January 2004, Adair was nominally replaced as president by Graham Blaikie who also served as Sorenson's cook in Honduras and the budget director for Merendon Int'l.

74.     Adair continued to participate in the scheme to defraud by representing SGD in its dealings with the Pennsylvania Securities Commission and in preparing a rescission offer to investors living in Pennsylvania who purchased securities of SGD through 2004.

75.     In August 2004, Adair sent a fax to Sorenson requesting that SGD repay Parklane investors who were subjects of the Pennsylvania Securities Commission investigation because they were US investors who had threatened to go to the SEC.

76.     In September 2004, Adair represented in a letter to an investor that "the fact that SGD had elected to make a formal rescission offer to Pennsylvania investors has no bearing on the financial integrity of the investment itself. . . . [W]e are pleased to report that the financial condition of Merendon Int'l and conversely SGD has never been stronger."

77.     Adair falsely represented in the rescission offer: that the net funds loaned to SGD were used in a joint venture between SGD and Merendon Int'l to provide capital for the purchase of raw materials (gold and silver ore) for its refinery; that the raw gold was stored on site in a bank vault and was insured; that the raw gold was refined under the supervision of SGD's on sight agent; that the daily production was audited; and that Merendon Int'l issued SGD its appropriate interest from the gross proceeds of the sale of gold which was paid on a monthly basis.  Adair also sent a copy of the rescission letter to Sorenson.

Securities and Exchange Commission
1801 California St., Ste. 1500
Denver, CO 80202
(303) 844-1000

78.     In December 2004, Sorenson and Adair offered the SGD investment to a prospective investor familiar with the mining and refining business.  The prospective investor confronted Adair with the accusation that SGD was a Ponzi scheme.  Adair admitted that SGD was in fact operating as a Ponzi scheme.

79.     On July 7, 2005, Hoffman told Adair that Merendon Int'l's books were being manipulated to hide Sorenson's misuse of funds.  Adair responded that everyone knew that. Adair further confirmed that he knew Sorenson had used "millions" for his own benefit and that all of the money Sorenson had was SGD money.  "Larry, it's gotta blow up some day," Hoffman said.  "No doubt about it," Adair replied, "my days are very numbered, I know that."

80.     A few days later, Adair sent a memorandum to Merendon Int'l's controller that demonstrated his knowledge that Sorenson was misusing SGD's funds and admitted that Sorenson had directed him to pay investors' funds from SGD to Sorenson's daughter, Laura Sorenson.

81.     From late 2005 through at least February 2007, Regier directed investor funds from Merendon Nevada's bank account to accounts that Adair controlled at Regent Bank in Florida for the benefit of Sorenson and SGD.

82.     In or about 2006 and 2007, Regier was not able to continue to pay SGD investors returns through banks account of True North Productions LLC, (an entity beneficially owned and controlled by Brost) at Wells Fargo Bank.  In the fall of 2006, Wells Fargo terminated Regier's ability to make redemptions from that account.

83.     Sorenson then made arrangements with Adair to pay investor returns out of bank accounts that Adair controlled at Regent Bank in Florida.

84.     In a series of e-mails in November 2006, Regier and Adair agreed to describe the cashier's checks they used to pay investor redemptions as "legal documents" on Fed Ex shipping labels.  Adair used the term "legal documents" as a ruse to avoid inspection by Customs when the package containing cashier's checks crossed the border into Canada.   Adair told Regier that he had lied to the bank about the purpose of the investor redemption checks in order to get the bank to issue them.

85.     Adair managed the flow of funds received by SGD from investors, and at the direction of Sorenson made distributions of those funds from March 2002 until March 2007.

86.     In or about November 2000, Capstick traveled to Honduras to view Merendon Int'l's refinery.  By at least February 2001, Capstick had become a Structurist with Capital Alternatives.   Starting on or about December 2001, Capstick offered and sold the securities of SGD and the selected group of companies.   In December 2003, Capstick became IFFL's Regional Executive for the Western United States.  He spoke at IFFL Structurist training conferences about various investments being offered for sale.

87.     IFFL, Brost and Capstick effected sales transactions in the securities of SGD for the accounts of others.  At the time of those transactions, they were not registered as broker dealers or associated with a registered broker or dealer.  As brokers or dealers, Brost and Capstick had a duty to determine if the representations they made about SGD's business operations and ability to pay were true.  Brost and Capstick knew or were reckless in not knowing that the representations each made about SGD were false and misleading.

88.     From at least December 2004 forward, Capstick joined Sorenson, Brost, Regier and others at the bi-annual "Summit Meetings" in which they managed the fraudulent scheme. At those meetings Sorenson gave an update on Merendon Int'l's operations, which were the purported source for SGD's revenue to pay investors' returns and collateral for the investors' investments.  Sorenson told the defendants at these summit meetings that Merendon Int'l was always in the development stage and had never reached the point of production.  In one of those meetings, Brost and Sorenson confirmed that they were equal owners of SGD.   Accordingly Capstick knew by at least December 2004 that SGD was operating as a Ponzi scheme, because Merendon Int'l was not producing sufficient gold to pay the returns represented to SGD investors.

89.     In August 2005, Capstick offered the SGD investment to investors, but failed to disclose that Brost and Sorenson owned and controlled SGD, and the lack of Merendon Int'l gold production.

90.     In November 2005, Capstick presented the SGD investment to another investor and failed to disclose Brost's and Sorenson's ownership and control of SGD and the lack of Merendon Int'l's production of gold.

91.     In November 2006, Capstick re-explained the SGD investment to the investor he had solicited in August 2005, but failed to disclose that Brost and Sorenson owned and controlled SGD, and the lack of Merendon Int'l gold production.  In December 2006, Capstick discussed with that same investor how to set up an account with another entity controlled by the Defendants in order to receive the proceeds from his SGD investment. He failed again to disclose Brost's and Sorenson's ownership and control of SGD or the lack of Merendon Int'l gold production.

92.     In February 2007, Sorenson, Brost, Capstick, Regier, Werner and others participated in a series of meetings of the IBG.  Among other things, they discussed the scheme's financial information from 2006, and the need to devise a plan to raise additional funds from new investors in order to pay purported returns to existing investors, to pay their operating expenses, and their own personal expenses.

93.     Werner became the president of SGD in or about April 2007 and served to the present date.

94.     In furtherance of the scheme, Werner, as the president of SGD, offered and sold the securities of SGD from at least April 2007 through November 2007.

95.     During 2008, Werner sent written communications to investors. Upon information and belief, Werner also caused monthly account statements to be sent through the Internet to SGD investors which falsely represented that their investments with SGD were earning returns of 2.5% per month.

96.     Werner knew from his participation in the IBG meeting that SGD did not have funds to pay the purported returns represented in the monthly statements, and that Merendon Int'l did not have revenue from gold production to pay the interest to SGD under the joint venture or the collateral promised to secure the investors' funds loaned to Merendon Int'l.

97.     Throughout the course of the scheme, Sorenson directed the movement of SGD funds, including the direction of incoming investor funds to pay obligations to other investors.

## 2.     Quatro Communications Corporation

98.     IFFL, Brost, Capstick, Regier, Sorenson, Adair, and Merendon Int'l engaged in a scheme to defraud investors in connection with the offer and sale of the securities of Quatro to IFFL members and then transfer the proceeds from the securities sales offshore to Merendon Int'l or other entities beneficially owned, controlled or directed, by one or more of the defendants.

99.     In furtherance of the scheme, IFFL, Brost, Capstick, Regier, Sorenson, Adair, and Merendon Int'l used Quatro as a device to raise money for Merendon Int'l's operations, to repay purported returns to SGD investors, and to secretly enrich them.

100.     Brost caused an associate to form Quatro, which was incorporated in Alberta, Canada on May 10, 2002.

101.     From approximately March 2002 through November 2004, IFFL, Brost, Capstick, and other Structurists acting under their direction, directly and indirectly offered and sold securities of Quatro in the form of promissory notes as one of the National Investment companies offered to one or more of the investors who resided in the Western District of Washington and other places within the United States and Canada.  IFFL, Brost, Capstick, and the Structurists acting under their direction represented that the Quatro promissory notes were for a term of ten years and paid an interest rate of 75% at the end of the term.  The terms of the promissory notes were later changed to one year with an interest rate of 5.75%.

102.     The defendants directly or indirectly sent Quatro offering materials and the promissory notes to investors through the mails or by means of interstate commerce.

103.     Between October 2001 through November 2003, IFFL, Brost, Capstick, and other Structurists acting under their direction falsely represented to prospective investors, among other things, that:

a)     Quatro was a company engaged in the telecommunications business and had sufficient earnings from business operations with which to pay interest on the

promissory notes.  They failed to disclose that Quatro was a shell corporation with no business operations from which to pay purported earnings ranging from 5.75% to 7.5% per year.

    b)  Investors' funds would be used in the telecommunications business. They failed to disclose that Quatro was simply a conduit through which investors funds were passed in a series of transfers through accounts and ultimately to Merendon Int'l, Sorenson Brost or other entities beneficially owned, controlled or directed, by one or more of the defendants.

    c)  Quatro was an independent business.  They failed to disclose Quatro was formed by an associate of Brost and that Brost controlled the distribution of investors' funds received by Quatro from its securities sales.

104.    IFFL, Brost, and Capstick knew or were reckless in not knowing that Quatro was a shell corporation and did not have sufficient business operations to pay interest on the promissory notes from 5.75% to 7.5% per year, that Quatro's funds were to be used for purposes other than investment in the telecommunications business such as transfer to Merendon Int'l, and that Quatro was not an independent business.

105.    Brost and Capstick effected sales transactions in the securities of Quatro for the accounts of others.  They were not registered or associated with a registered broker or dealer. As brokers or dealers, Brost and Capstick had a duty to determine if the representations they made about Quatro's business operations and ability to pay were true. Brost and Capstick knew or were reckless in not knowing that the representations each made about Quatro were false and misleading.

106.    IFFL, Brost, Capstick and other Structurists acting under their direction offered and sold approximately $42,827,734 in securities of Quatro.

107.    In furtherance of the scheme, Quatro transferred approximately $8,763,149 to the bank accounts of Adair.  Adair transferred the funds to various accounts for the benefit of Merendon Int'l, Sorenson, and Brost or other entities beneficially owned, controlled or directed, by one or more of the defendants.

108.    Adair knowingly participated in the scheme to defraud the investors who purchased Quatro securities by accepting investors' funds into his attorney trust accounts and paying those funds as purported returns to SGD investors or secretly transferring investors' funds for the personal benefit of Sorenson or Brost, and to other companies beneficially owned or controlled by one or more of the defendants.

109.    On September 30, 2004, IFFL, Brost, Capstick and other Structurists were ordered by the Alberta Securities Commission not to trade securities including, but not limited to, the securities of Quatro, SGD or other companies.  Brost also agreed that he would not in the future incorporate or organize any company that would trade in securities or act as an advisor as those terms are defined in the Alberta Securities Act.

### 3.    Rapid Express Corporation

110.    IFFL, Brost, Capstick, Regier, Sorenson, Adair, and Merendon Int'l engaged in a scheme to defraud investors in connection with the offer and sale of the securities of Rapid Express Corporation ("Rapid Express") to IFFL members and then transfer the proceeds from the securities sales offshore to Merendon Int'l or other entities beneficially owned, controlled or directed, by one or more of the defendants.

111.    In furtherance of the scheme, IFFL, Brost, Capstick, Regier, Sorenson, Adair, and Merendon Int'l used Rapid Express as a device to raise money for Merendon Int'l's operations, to repay purported returns to SGD investors, and to secretly enrich themselves.

112.    In or about September 2003, Brost announced at a Structurist training meeting that a new company was replacing Quatro as one of the National Investments to be offered by IFFL and its Structurists starting October 1, 2003.

113.    Brost caused an associate to form Rapid Express, which was incorporated in November 3, 2003.  An employee of IFFL was listed as its nominal president.  However, Brost, with Regier's assistance, controlled the administrative side of Rapid Express and directed the flow of funds from Rapid Express to Merendon Int'l.

114.    From approximately September 2003 to November 2004, IFFL, Brost, Capstick, Regier and Structurists acting under their direction offered and sold the securities of Rapid

Express in the form of one year promissory notes to investors, some of whom resided in the Western District of Washington and other locations in the United States and Canada.

115.    The defendants directly or indirectly sent Rapid Express offering materials and the promissory notes to investors through the mails or by means of interstate commerce, some of whom resided in the Western District of Washington and other locations in the United States and Canada.

116.    As part of the scheme, Brost, Capstick and other Structurists under their control instructed U.S. investors to wire transfer their funds to a U.S. currency bank account in Canada in order to purchase the promissory notes of Rapid Express.

117.    Between October 2001 through November 2004, IFFL, Brost, Capstick,  and other Structurists acting under their direction made false and misleading statements of material fact to prospective investors including, among other things, that:

    a)    Rapid Express was a profitable company able to pay interest on its promissory notes of approximately 8% per year. They failed to disclose that Rapid Express was a shell corporation and had no business operations from which to pay purported interest of 8% per year on the promissory notes sold to investors.

    b)    Investors' funds would be used to further the business of Rapid Express, which was purportedly developing rapid express trains.  They failed to disclose that Rapid Express was a shell corporation with insufficient assets or income from operations to satisfy its obligations to Rapid Express.

    c)    Rapid Express was an independent business.  They failed to disclose that Rapid Express was formed at the request of Brost and that Brost controlled the distribution of investors' funds received by Rapid Express from its securities sales.

118.    Regier and Brost knew that Rapid Express was nothing but a shell corporation. Despite this knowledge and at Brost's direction, Regier drafted offering materials for Structurists to use in the sale of Rapid Express securities that falsely represented Rapid Express was seeking capital resources to participate in the rapid express train business.  Regier simply

pulled materials from the Internet relating to the transportation industry to create the offering materials. Brost and Regier knew that Rapid Express was not a viable company but rather a means to raise capital which was transferred to accounts of Adair for the benefit of SGD, and ultimately Merendon Int'l, Sorenson, Brost or entities beneficially owned, controlled or directed by one or more of the Defendants. Regier and Brost knew that Brost, Capstick and Structurists under their control would use the false and misleading offering materials prepared by Regier to offer and sell the securities of Rapid Express to IFFL members. As officers of IFFL, Brost's and Regier's knowledge is attributed to IFFL.

119. Between approximately September 2003 and November 2004, IFFL Brost, Capstick, Regier and Structurists acting under their direction, offered and sold approximately $39,665,687 of the securities of Rapid Express.

120. IFFL, Brost and Capstick effected sales transactions in the securities of Rapid Express for the accounts of others. They were not registered or associated with a registered broker or dealer. As brokers or dealers, Brost and Capstick had a duty to determine if the representations they made about Rapid Express' business operations and ability to pay were true. Brost and Capstick knew or were reckless in not knowing that the representations each made about Rapid Express were false and misleading.

121. In July 2004, Sorenson and Capstick attended an IFFL training session for Structurists in Kelowna, Alberta Canada. At that meeting, Brost explained that funds for SGD redemptions came from funds that investors paid as investments in Quatro, Rapid Express, Arbour Energy and Merendon Nevada. Based on their participation in this meeting, Sorenson and Capstick knew that funds from Quatro, Rapid Express, Arbour Energy, and Merendon Nevada were being used to pay purported earnings to SGD investors rather than using funds paid to SGD by Merendon Int'l as part of its joint venture agreement.

122. Rapid Express transferred approximately $11,737,729 to Adair's trust accounts at Regent Bank and to other entities beneficially owned, controlled or directed by one or more of the defendants.

123.     Adair knowingly participated in the scheme to defraud the investors who purchased Rapid Express securities by accepting investors' funds into his attorney trust accounts and paying those funds as purported returns to SGD investors or transferring investors' funds to various accounts for the benefit of Merendon Int'l, Sorenson or Brost, and to other companies beneficially owned or controlled by one or more of the defendants.

### 4.     Arbour Energy Inc.

124.     IFFL, Brost, Capstick, Regier, Sorenson, Adair, and Merendon Int'l engaged in a scheme to defraud investors in connection with the offer and sale of the securities of Arbour Energy to IFFL members and then transfer the proceeds from the securities sales offshore to Merendon Int'l other entities beneficially owned, controlled or directed, by one or more of the defendants.

125.     In furtherance of the scheme, IFFL, Brost, Capstick, Regier, Sorenson, Adair, and Merendon Int'l used Arbour Energy as a device to raise money for Merendon Int'l's operations, to repay purported returns to SGD investors, and to secretly enrich themselves.

126.     In or about September 2003, Sorenson, Adair, and Arthur Wigmore who were members of the Merendon Int'l board of directors and Brost met in Calgary to discuss using a public company named Arbour Energy to raise money for Merendon Int'l through the sale of securities of Arbour Energy to IFFL members.  At the time, Arbour Energy effectively had no business operations and had filed for bankruptcy protection.

127.     On December 2, 2003, Brost, Capstick, Regier, Adair, Sorenson and others participated in an IFFL conference for Structurists.  With the knowledge of Brost, Regier, Adair and Sorenson, Capstick told the Structurists that IFFL was launching a new investment opportunity in a public company listed on Canadian securities exchange.  Although not named in the presentation, the company was Arbour Energy.

128.     In or about March 2004, one of Arbour Energy's directors became Merendon Int'l's in-house counsel.  Wigmore, who was a director of Merendon Int'l, became a director of Arbour Energy in or about July 2004.

129.    In or about May 2004, Brost announced at an IFFL conference for Structurists that IFFL was offering investments in Arbour Energy.

130.    Between July 2004 and December 2005, IFFL, Brost, Capstick, and Structurists acting under their direction offered and sold the securities of Arbour Energy in the form of preferred shares that purportedly paid a 5.75% cumulative, annual dividend.

131.    Between July 2004 and December 2005, IFFL, Brost, Capstick, and Structurists acting at their direction made false and misleading statements of material fact including, among other things that:

    a)   Arbour Energy was engaged in the business of acquiring properties in the oil and gas sector.  They failed to disclose that Arbour Energy did not have sufficient income from its operations to pay the purported returns of 5.75% per year.

    b)   Proceeds from the sales of Arbour Energy's securities were to be used in furtherance of its business operations.  They failed to disclose that funds invested in Arbour Energy were to be transferred to Merendon Int'l and other entities beneficially owned, controlled or directed by one or more of the defendants.

    c)   Arbour Energy was an independent business selected as an investment for IFFL members by the IBG.  They failed to disclose that Arbour Energy was associated with Merendon Int'l, Sorenson and Brost, and that Brost and Regier directed the transfer of funds raised through the sale of Arbour Energy securities.

132.    IFFL, Brost and Capstick knew or were reckless in not knowing that Arbour Energy did not have sufficient income from operations to pay purported returns of 5.75% per year.  They knew that investors' funds from the purchase of securities of Arbour Energy were to be transferred to Merendon Int'l other entities beneficially owned, controlled or directed, by one or more of the defendants.  They knew from their participation in the IBG that Arbour Energy was not an independent business.

133.    IFFL, Brost and Capstick effected sales transactions in the securities of Arbour Energy for the accounts of others.  They were not registered or associated with a registered broker or dealer. As brokers and dealers, IFFL, Brost and Capstick had a duty to determine if the representations that they made about Arbour Energy's business operations and ability to pay were true.  Brost and Capstick knew or were reckless in not knowing that the representations that each made about Arbour Energy were false and misleading.

134.    In furtherance of the scheme, an IFFL employee sent an email to Regier and others Structurists in November 2004, containing a letter to investors from Brost that was designed to manipulate IFFL members to purchase preferred securities of selected companies including Arbour Energy and Strategic Metals.  The email to Regier and Structurists states among other things:

> Capital Alternatives administration will walk new Member through the paperwork process.  This will guide the Member to Arbour Energy for registered product and for non registered product to Strategic metals preferred shares series 2. Please use the attached form letter to direct the new Member for restructuring.  For YOUR information: the additional Companies listed on the attached form letter other than Capital Alternatives are there to ensure that it is not perceived by any individual or Company that IFFL and the marketing team is only promoting Capital Alternatives. (In other word the other options are there for a smoke & mirror effect.)

135.    Between July 2004, and December 2005, IFFL, Brost, Capstick and Structurists at their direction offered and sold securities in the form of preferred shares of Arbour Energy to IFFL members, including residents of the Western District of Washington and other locations in the United States and Canada, for proceeds of approximately $47,338,084.

136.    As part of the scheme, Brost instructed Regier to transfer investors' funds received from the sales the securities of Arbour Energy directly to Merendon Int'l with instructions for Merendon Int'l to further transfer part of the funds to other entities controlled or beneficially owned by one or more of the defendants.

137.    On November 16, 2005, the Alberta Securities Commission suspended trading in the securities of Arbour Energy.

### 5. Strategic Metals Corporation

138.    IFFL, Brost, Capstick, Regier, Sorenson, Merendon Int'l and Adair engaged in a scheme to defraud investors by offering and selling the securities of Strategic Metals to IFFL members and then transferring the proceeds from the sale of the securities offshore to Merendon Int'l other entities beneficially owned, controlled or directed, by one or more of the defendants.

139.    In furtherance of the scheme, IFFL, Brost, Capstick, Regier, Sorenson, Adair, and Merendon Int'l used Strategic Metals as a device to raise money for Merendon Int'l's operations, to repay purported returns to SGD investors, and to secretly enrich themselves.

140.    Strategic Metals was incorporated in Alberta, Canada on April 27, 2004, and operated from offices in Calgary, Alberta.  Brost, Sorenson, and Arthur Wigmore were initially listed as directors of Strategic Metals but were removed over six month later and replaced with Edna Forrest, Carol Weeks and Regier, who were employees of IFFL.

141.    In 2004, Brost owned 50% of Strategic Metals.

142.    Brost requested that Regier join the board of directors of Strategic Metals and advised him that Strategic Metals would be the National Investment used to raise money through the sale of preferred shares by means of offering memoranda with the funds invested by IFFL members to be transferred through True North Productions.

143.    Brost and Regier asked Forrest to become the president and a director of Strategic Metals.  Although Forrest had no experience in running a mine, Brost told her that he and Sorenson would help her and be running the mine. Forrest had been employed by IFFL since December 2003 to process memberships.  She reported to Regier and ultimately to Brost. She was paid by Expedia Logistics, a company Brost controlled and Regier managed, for both her work at IFFL and Strategic Metals.

144.    In or about December 2003, Brost and Sorenson both spoke to an IFFL Structurist conference.  Sorenson reported the amount of ounces of gold Merendon Int'l possessed in proven and probable reserves, and falsely represented that it had a ratio of assets

Securities and Exchange Commission
1801 California St., Ste. 1500
Denver, CO 80202
(303) 844-1000

to investments of 3 to 1 based on either gold in the vault or in the ground for every dollar that was managed by SGD.

145.    In July 2004, at another IFFL conference attended by Structurists, members, and potential investors, Sorenson took the members on a tour of the Tulameen gold property owned by Merendon Int'l through Stone Mountain Resources Ltd.

146.    From approximately July 2004 through August 2005, IFFL, Brost, Capstick and Structurist acting under their direction, directly and indirectly offered and sold the securities of Strategic Metals in the form of preferred shares, which either had a term of five years and purportedly paid 14.95% interest per year, or a term of seven years and purportedly paid 11.75% interest per year.

147.    Brost along with Weeks drafted the offering materials for Strategic Metals including offering memoranda dated July 1, 2004, January 10, 2005, and June 1, 2005, and a Capital Alternatives brochure containing a Term Sheet for Strategic Metals that were sent to prospective investors.  Regier signed the offering memoranda and certified that each did not contain misrepresentations.

148.    Between July 2004 and August 2005, IFFL, Brost, Capstick and Regier made false and misleading statements of material fact including among other things:

a)    Strategic Metals was a profitable company which could pay interest of either 14.95% or 11.75% per year to investors who purchased its preferred shares. They failed to disclose the company was not profitable.

b)    Strategic Metals was in the business of financing or acquiring through arms length transactions, companies for the acquisition of mining reserves, capital costs for milling production equipment, and milling production and general production of precious metals. They failed to disclose that investors' funds were not used to finance arms length companies, but were instead transferred to Merendon Int'l or other companies beneficially owned, controlled or directed by one or more of the defendants.

c)   Investors' participation would be secured by proven precious metals reserves, probable precious metals reserves and precious metals under contract for refining at a ratio of not less than 3:1 asset value over dollars invested.  They failed to disclose that Strategic Metals did not hire any professionals to determine if the company's properties contained proven or probable reserves of precious metals before entering into various agreements.

d)   Strategic Metals was an independent and successful business.  They failed to disclose that Strategic Metals was associated with Merendon Int'l, Sorenson and Brost, and that Regier, at the direction of Brost, transferred investors' funds from Strategic Metals to Merendon Int'l.

e)   They failed to disclose the true amount of commissions paid to Capital Alternatives.

f)   They failed to disclose that Forrest, an officer and director, and Regier, a director, were employed by IFFL.

g)   They failed to disclose compensation to Regier and Weeks from Expedia.

h)    They failed to disclose that Strategic Metals had agreed to pay Expedia the sum of 0.5% of all funds raised through investments in Strategic Metals up to a yearly amount of $200,000.

149.   IFFL, Brost, Capstick and Regier knew or were reckless in not knowing their statements to investors were false and misleading.

150.   IFFL, Brost, Capstick, Regier, Sorenson, and Merendon Int'l offered and sold approximately CAD $36,400,000 of the securities of Strategic Metals to investors, some of whom resided in the Western District of Washington, and other locations in the United States and Canada.  During this time period, Strategic Metals had no income from other sources. Metals.

151.   IFFL, Brost and Capstick effected sales transactions in the securities of Strategic Metals for the accounts of others.  They were not registered or associated with a registered broker or dealer.  As brokers and dealers, IFFL, Brost and Capstick had a duty to determine if

the representations that they made about Strategic Metals' business operations and ability to pay were true.  Brost and Capstick knew or were reckless in not knowing that the representations that each made about Strategic Metals were false and misleading.

152.    In December 2005, in response to requests for documents from the Alberta Securities Commission related to Strategic Metals, Brost, Sorenson and Regier discussed creating post-dated documents for the transfer of funds from Strategic Metals to entities controlled by the defendants.  For example, Regier created a promissory note from The Cheer Place, Inc. to correspond to transfers of investors' funds it received from Strategic Metals. In addition, Brost created a promissory note from Honducan to Strategic Metals to correspond to transfers of investors' funds paid to Arbour Energy.

153.    Sorenson admitted that he knew that Brost was using the roughly $37 million of investors' funds raised by Strategic Metals to pay Merendon Int'l and repay investors in SGD through transfers made to True North Productions.

**6.    Merendon Mining Nevada, Inc.**

154.    From approximately October 2002 through November 2007, IFFL, Brost, Regier, Capstick, Merendon Int'l, Sorenson, SGD, Adair, Werner and Merendon Nevada engaged in a scheme to defraud investors by offering and selling the securities of Merendon Mining (Nevada) Inc. ("Merendon Nevada") to IFFL members and then transferring the proceeds to SGD, Merendon Int'l other entities beneficially owned, controlled or directed, by one or more of the defendants.

155.    In furtherance of the scheme to defraud, Brost caused an associate to incorporate Merendon Mining (Colorado), Inc. in Nevada on December 30, 2002.  The company later changed its name to Merendon Nevada on October 5, 2004.

156.    Merendon Nevada was beneficially owned and controlled by Brost and Sorenson.

157.    In furtherance of the scheme, Merendon Nevada opened a bank account with US Bank in Colorado in February 2003.  One of Merendon Int'l's directors and Brost's wife, Elizabeth Brost, were the initial signatories on the account.  Merendon Nevada opened

additional bank accounts with US Bank in November 2003 with Brost, Brost's wife, Regier, and Capstick as the signatories on the accounts.

158.    In furtherance of the scheme in or about July 2003, Sorenson requested that one of Merendon Int'l's directors locate and develop gold properties in Colorado and Arizona for Merendon Nevada to operate.

159.    In November 2003, IFFL retained Werner as its corporate counsel to prepare opinions about Merendon Nevada's program to expend funds for the development of certain mining properties.

160.    At the December 2003 IFFL conference for Structurists, Capstick told Structurists and IFFL members about a National Investment offered by Merendon Nevada. Capstick discussed information he had received from Werner about the program.  He stated Brost was preparing the plan for January.  Brost, Sorenson and Adair were present at the conference.

161.    On or about October 5, 2004, Brost was listed as the president, Regier was listed as the secretary and treasurer, and Capstick was listed as the vice president of marketing of Merendon Nevada.

162.    Brost requested that Regier serve as a director of Merendon Nevada.  Regier also performed bookkeeping for Merendon Nevada through Expedia Logistics.

163.    Between November 2002 and November 2007, Merendon Nevada, IFFL, Brost, Capstick and the Structurists directly and indirectly offered and sold securities of Merendon Nevada in the form of investment contracts, and promissory notes containing an eight month term that paid 8.75% per annum, but which the defendants represented to be long term investments that were automatically renewed unless the investor gave other instructions.  These defendants directly and indirectly offered and sold approximately $140 million of Merendon Nevada securities to IFFL members, some of whom resided in the Western District of Washington and in other locations in the United States and Canada.

164.    IFFL, Brost, Capstick and Structurists acting under their direction represented to prospective investors that the Merendon Nevada promissory notes were part of a long term

investment in the International Investment program that were to be held for approximately eight years.   The Defendants offered the Merendon Nevada promissory notes to the public and the proceeds were not used solely to fund current operations.

165.   Merendon Nevada, IFFL, Brost, Capstick and Structurists acting under their direction gave investors offering materials prepared by Brost, which included the "Merendon Mining (Nevada) Inc. Business Plan," and made similar false and misleading statements of material fact including, among other things, that:

a)   "Merendon [Nevada] is a precious metals explorer, developer, and producer with a successful history of discovering, developing, and profitably operating gold and other metal mines in the United States.  Merendon [Nevada] is a company engaged in exploration, development and production of gold and other precious metals."  They failed to disclose that Merendon Nevada was not producing enough revenue to cover its operating expenses or the required payments to investors.

b)   Investors' promissory notes were secured by a pledge of certain proven gold reserves from the "Glory Hole" or Patch mineral properties located in Gilpin County, Colorado.  They failed to disclose that Merendon Nevada never obtained clear title to those reserves.

c)   The Company would be profitable in the first year of production of gold and other metals and would increase profits over the next 15 years.  They failed to disclose that the Company was not profitable in its first year of operations or any of the following years.

d)   The initial mine sites including the Glory Hole or Patch properties had proven, commercially valuable mineral rights.  They failed to disclose that Merendon Nevada did not have sufficient information to determine if the Glory Hole and Patch properties contained proven, commercially valuable mineral rights.

e)   "Merendon has agreed to contract with Merendon Minerals (Texas) Inc., a Texas corporation to provide contract services as called for in this and other agreements."  They failed to disclose that no corporation named Merendon Minerals

(Texas) Inc. was registered with the State of Texas.  Merendon Nevada never entered into any contract with Merendon Minerals (Texas) Inc. to develop its mining properties.

f)   "The contract miner will process at least 40,000 tons of mineral bearing earth per month. . . .  In the event that the contract miner fails to produce at least $1,000 per ton of earth processed in revenues from such processing, . . .  the contract miner will pay the participant's shortfall in the participant's future development payments to Merendon and also provide a minimum return to each participant of six and one half (6.5%) percent of the amount of cash which the participant has paid to Merendon for the Participant's first year cash payment to Merendon commencing with the fourth year of the program."  They failed to disclose that Merendon Nevada never entered into any processing contract with the terms listed above.

g)   They failed to disclose to investors that the Defendants intended to transfer investors' funds out of the bank accounts of Merendon Nevada and to the trust accounts of Adair and Werner for further payment to Merendon Int'l or to other entities for the benefit of the defendants.

166.    Brost and Capstick knew from their involvement with the business of Merendon Nevada that the statements in the Business Plan and made verbally to investors were materially false and misleading.  They knew that Merendon Nevada mining properties were not in production. They knew from discussions with Regier that incoming investors' funds were used to pay purported returns to other investors.

167.    Merendon Nevada's financial statements show that from at least December 31, 2002 to June 30, 2007, it was not profitable and did not generate revenue sufficient to repay the principal and interest owed to its investors.  Brost, Capstick and Regier as officers and directors of Merendon Nevada knew at all relevant times the financial condition of Merendon Nevada.

168.    In furtherance of the scheme, Brost directed Regier to transfer investors' funds from Merendon Nevada's bank to the bank accounts of True North Productions, which Brost

controlled, for the purpose of paying purported returns to investors, and to transfer funds to

SGD through accounts controlled by Adair or Werner.

169.    Brost received approximately 5% of the investors funds invested in Merendon

Nevada.

170.    In furtherance of the scheme, Merendon Nevada sent a letter in May 2008 to its

investors, which Brost, Regier and Capstick drafted, that stated that Merendon Nevada had no

business relationship to Merendon Int'l and that the principals of the two companies, though

they knew each other socially, did not have a business relationship.  They omitted to disclose

that Brost and Sorenson, the principals of the two entities, had a substantial business

relationship.

**B.      Defendants' Knowledge of the Scheme**

171.    In early 2007, Brost, Sorenson, Regier, Capstick and Werner convened a series

of meetings in order to review the scheme's "financials" from 2006, to devise a plan to raise

additional funds from new investors and to agree how to apportion those new funds among

items such as returns to existing investors, marketing expenses and their own personal profit.

172.    In advance of those meetings, on February 5, 2007, Brost sent Sorenson, Regier,

Capstick and Werner an eleven-page e-mail that confirms the Defendants' participation in a

Ponzi scheme.  Brost described the IFFL marketing efforts as the engine of "fresh capital" used

to meet the  "cash call" of investor returns:

> IFFL: Original[ly] created as Capital Alternatives Inc. and then re-started
> as The Institute For Financial Learning. . . . [I]n March 1999, [Capital
> Alternatives] moved forward with what was then one marketer, Milo A.
> Brost.  Today the IFFL has more than 100 marketers (Structurists) which
> will rise to 140 by fiscal year end 2007. They will collectively produce in
> excess of  $ 100M USD of fresh capital this year. . . to date the marketing
> team under my guidance has produced sufficient capital to support all of
> our activities . . . .

> Over the years we have created a National Asset hold position and an
> International Management Participation, with this in mind the [investor]
> today has the capacity to redeem $'s for a variety of reasons, however also

as of today this cash call has been born by marketing efforts to continue to expand and meet the cash call . . . .

173.    Brost went on to explain in the email that the scheme was running its course and either the proposed defendants or "a regulatory body" would have to bring the IFFL's activities into check:

> [T]he IFFL should peak this year and systematically wide [sic] itself down, should the process take 6 months or 6 years is debatable, however it is obvious that at some point the IFFL will have to bring its activities into check.  At such time all issues of funding are going to become critical, whether we choose to make the move or a regulatory body does it for us.

174.    Brost stated that the scheme was only designed for a 5-year cycle and the obligations to investors on the International Investment side were "exponentially" increasing:

> SGD . . . : Today there is a composite obligation of somewhere between $ 400 to 500 M. . . . .   Problem: Although we have keep [sic] up with redemptions and business building over the last 8 years the process was only ever built on a five year cycle. The farther we get down this road the more the dollars exponentially will get out of control.

175.    On the National Investment side, Brost discussed funds owed to Merendon Nevada investors and explained why they could not be repaid:

> [Merendon Nevada]:  Has approximately $110,000,000 USD of short term promissory notes that cannot be renewed beyond a second term. . . . Solution:  To cash out all note holders . . . .  Problem:  No identifiable large sums of money, i.e., $110 M.

176.    Brost further explained in the email that lack of proper accounting records and SEC scrutiny would keep Merendon Nevada from restructuring its notes into equity:

> Alternate Solution: To create an offering memorandum and place all note holders into an equity position.  Problem:  To complete an OM one must provide detailed accounting, or at least consolidated balance sheets.  Brad [Regier] and Bill [Camp] are no where near to such accounting.  Also the company will have to demonstrate Mining Values sufficient to support such an offering and the offering will have to be vetted before the very SEC individuals in States seeking to hang Milo [Brost] and Ward

[Capstick] for Securities Violations.  What do you think the odds are of Merendon Nevada [Merendon Nevada] getting such an offering approved?

177.    Finally, Brost discussed the fact that they could not unwind the "loans" Merendon Nevada made to True North Productions (a Brost-controlled entity that functioned as a conduit for investor funds) in order to pay investor returns because of True North Productions' "invisible business purpose":

> True-North Productions LLC has outstanding loans to [Merendon Nevada] in an amount exceeding $ 60,000,000 USD.  At the present we would be hard pressed to create a viable underlying business theme to even justify TN's existence.

> Solution: As it stands today there is only one possible way out, and that is have a significant amount of $'s loaned or create a Joint Venture with [True North Productions], say $ 70,000,000.  This would allow a [Merendon Nevada] repayment, clean up the outstanding loans and allow TN to clean up its activities. For a Joint Venture to be effective we must establish a viable business premise and a cash flow model to accomplish the same objectives as a loan.  Problem: No viable lenders given TN's invisible business purpose and no possibility of a Joint Venture.

178.    On February 8-11, 2007, Brost, Sorenson, Regier, Capstick and Werner met in Honduras.  Acting as Chairman of the IBG, Werner recorded minutes of the meetings ("the Minutes") and circulated them to Brost, Sorenson, Regier and Capstick on February 18, 2007. Brost, Sorenson, Regier, Capstick and Werner approved the Minutes at a follow-up meeting in March 2007.

179.    The Minutes show that Brost, Sorenson, Regier, Werner and Capstick discussed a "2006 Cash Expenditures of IBG (U.S. Dollars)."  This discussion was based on a summary of cash flow prepared by Regier with a copy of the cash flow summary included in the Minutes. Regier's summary confirmed the existence of the Ponzi scheme, showing that:

> a)    New investors provided the only source of funding ($97.3 million for 2006, virtually all through Merendon Nevada);

> b)    Investors' funds were used to pay returns to investors ($35 million for 2006);

Securities and Exchange Commission
1801 California St., Ste. 1500
Denver, CO 80202
(303) 844-1000

c)  Brost and Sorenson directed the payment of investors' funds for their benefit ($9.1 to Brost and $24.5 million to Sorenson).

180.    Brost, Sorenson, Regier, Werner and Capstick also reviewed the various issues described above from Brost's February 5, 2007 e-mail.  In so doing, Brost, Sorenson, Regier, Capstick and Werner demonstrated their control over the National and International Investments and knowledge of the scheme.  For example, the Defendants discussed the fact that the president of Arbour Energy had failed to execute a contract to purchase a company from Merendon Int'l and that he had not taken steps to keep Arbour Energy shares trading on Canadian exchanges.  The Defendants moved to remove the president of Arbour Energy if he did not act upon their instructions.

## C.    Continuation of the Admitted Ponzi Scheme in 2007

181.    After the IBG meetings, Sorenson, Brost, Capstick, Regier and Werner went on to offer and sell an additional $50 million in securities to investors.  Most of those funds were raised through the sale of additional Merendon Nevada promissory notes with corresponding investments in SGD or other International Investments.

182.    Shortly after participating in the IBG meetings in February and March 2007, Werner began moving IFFL investors' money through his trust account at the direction of Sorenson.  Werner knew from his conversations with Regier that the funds were from investors in Merendon Nevada.  He knew from his participation in the IBG meetings that the defendants were using investors' funds as part of a Ponzi scheme.

183.    Werner knew that at least one purpose for using his trust account was to hide the sources of funds.  For example, on March 30, 2007, Werner and Regier discussed via e-mail their use of Werner's trust account to move funds between IBG entities in order to hide the fact that Brost was behind the fund movement.

184.    On March 29, 2007, in the wake of the IBG meetings, Brost e-mailed Werner, Regier and Capstick in order to schedule a meeting "to discuss Ltd. Partnerships as a product to replace initially all SGD account managers . . . .  The purpose of this meeting is to look at an

overall solution to the underlying asset and how best to get out in front of the Reglatory [sic] Bodies."

185.    In a series of e-mails in April 2007 involving Brost, Sorenson, Werner and Regier, Bearstone was played a role in paying returns to SGD investors in connection with the scheme.  As the president of Bearstone, Werner furthered the scheme by causing an offering of limited partnership shares Goldstone, in which Bearstone was the general partner.  This offering raised at least $3 million from November 2007 through March 2008.  At least some of the funds raised by this offering were directed to SGD in furtherance of the scheme.

186.    The Bearstone / Goldstone offering was marketed by Hav-Loc, which was constituted primarily of IFFL Structurists and led by one of Brost's top Structurists, Thierry Geveart.  Brost had an arrangement with Geveart to receive 1% of all funds Hav-Loc raised.

187.    In August 2007, Brost engaged in an effort to convert investors' lending positions with SGD into equity positions with a limited partnership.

188.    On August 3, 2007, Brost e-mailed Werner and Regier regarding that effort. Brost stated:

> "I am out here running my mouth and cannot help but feel like I am twisting in the wind with no basis of certainty."  . . Brost also stated:  "I have made it no secret that the organization and especially Gary [Sorenson] (for Business Growth) is going to need to have serious dollars immediately …. [sic] This lack of forward traction with confirmations for D/D is going to be the death of the organization .... [sic]  Cash and lots of it is going to be needed and now frankly …. [sic] Time has not been our friend for a while, are you done????  Is the Geological info confirmed, I do not want to panic, however, between being out here running my moutllh [sic] and the mounting need for Cash through put, we are but days from disaster.  …. [sic]  I need to know what is going on. … [sic] I have tried to call Gary's office in Honduras however between no answer, him being out and messages I have not connected to date …. [sic] I am very concerned."

189.    The next day, on August 4, 2007, Brost met with a group of SGD investors in South Carolina.  Brost made the following misrepresentations:

a) That proven ounces of gold at Merendon de Peru were to back all of the LP shares. Brost stated the reserves had been proven, the assaying and drilling had been done, and they were ready to start production. He failed to disclose that he had "no basis for certainty" regarding the reports and that the geological reports had not been completed.

b) That the IFFL investments were doing well, didn't need new capital and were self-sustaining. He failed to disclose the immediate need for cash and the resulting "death of the organization" and "disaster" that was "but days away" if the cash was not raised.

190. In October 2007, SGD, while Werner was president, issued a "Comprehensive Notice" to investors that discussed the new limited partnership program that was set up to absorb all of the existing National and International Investments, but he failed to disclose the existence of the Ponzi scheme and the IBG's control of all of the National and International Investments.

191. On or about November 2007, Werner became the president of Bearstone. Defendants had previously used Bearstone to absorb Quatro's and Rapid Express' obligations to investors.

192. In November 2007, Werner announced to investors that he had become the president, director and controlling shareholder of Bearstone. From November 2007 to March 2008, Bearstone raised over $3 million from investors through securities offered by a limited partnership.

193. On March 14, 2008 and March 31, 2008, Werner spoke with an SGD investor by telephone and told him that SGD was going to be able to repay his investment by acquiring mining properties from Merendon Int'l. He attempted to lull the investor by offering to "bump up" the amount SGD owed him. He further lulled the investor by stating the "assets are very resilient" and the "goal line is very close." He did not disclose SGD's or Merendon Int'l's role in the Ponzi scheme. Werner assured the investor he was acting "in good faith" but did not disclose his role in IBG and the scheme.

194.    On May 2, 2008, Werner held a conference call with at least fifteen SGD investors, in which he again failed to disclose the existence of the Ponzi scheme.  Instead, Werner made lulling statements about potential sources of repayments of the SGD investments.

195.    In July 2009, Werner sent an e-mail to all SGD investors stating that he was reviewing the status of SGD investments and that, if they sent him $300, he would be able to make a determination of whether they held positions with SGD.  Werner again failed to disclose SGD's part in the Ponzi scheme.

196.    All told, Merendon Int'l received at least $100-150 million in investor funds through funds raised through IFFL investments.

197.    Merendon Int'l held itself out to investors as the successful business ultimately generating the returns that investors were to receive through their IFFL-related investments when, in fact, Merendon Int'l was not profitable, never reached a production stage, and did not have business revenues remotely capable of paying the promised returns to investors.

198.    Merendon Int'l used its officers, bank accounts and employees to hide the movement of investor funds.  For example, Arbour Energy sent incoming investor funds directly to Merendon Int'l, and Regier included instructions that Merendon Int'l redirect portions of the funds to Brost-controlled accounts which were used to pay returns to existing investors.

199.    Additionally, Sorenson, acting as Merendon Int'l's President / CEO, directed Adair to move investor funds through a number of bank accounts and ultimately back to investors.

200.    Merendon Int'l employees and board members, namely Graham Blaikie and Adair, held officer or director positions with SGD and/or moved SGD funds in furtherance of the Ponzi scheme.

201.    Merendon Int'l entered into illegitimate transactions with other entities controlled by Sorenson and Brost to paper-over the movement of investor funds and move funds to Merendon Int'l in exchange for insufficient consideration.  For example: Strategic Metals used investor funds to purchase an entity called Stone Mountain from Merendon Int'l.

Regier, Sorenson and Brost were involved in the negotiations for this transaction.  Rather than discussing how much Stone Mountain was worth, the discussions focused on how much could be paid to Merendon Int'l for tax and appearance purposes.  Similarly, Arbour Energy loaned investor funds to Merendon Int'l even though there was no documentation in place for the loan.  When the transaction came into question, Brost and Sorenson collaborated to establish an amount of interest owed.  Arbour Energy's loan to Merendon Int'l was erased through another sham transaction in which Arbour Energy purchased a company called Tar Sands Recovery Ltd.

202.     As a result of the defendants actions discussed above, from approximately August 1999 through at least March 2008, SGD, IFFL, Merendon Int'l, Merendon Nevada, Brost, Capstick, Regier, Sorenson, Adair and Werner engaged in a scheme to defraud investors by offering and selling the securities of SGD, Quatro, Rapid Express, Arbour Energy, Strategic Metals, Merendon Nevada, and other companies to IFFL members and then transferring the proceeds from the sale of those securities offshore to Merendon Int'l other entities beneficially owned, controlled or directed, by one or more of the defendants.  In the course of the scheme defendants obtained money from investors through false and misleading statements and omissions of material facts.  They also engaged in acts, transactions and courses of business that operated as a fraud upon the IFFL members who were investors in the various securities.  The defendants violated Section 10(b) of the Exchange Act and Rule 10b-5, and Section 17(a) of the Securities Act.

203.     SGD, IFFL, Merendon Int'l, Merendon Nevada, Brost, Capstick, Sorenson, Adair, Werner and Regier acted with requisite scienter.

204.     The Defendants' actions resulted in substantial losses to investors.

### III.     Unregistered Offers and Sales of Securities

205.     From September 1999 through approximately November 2007, SGD, IFFL, Brost, Capstick, Sorenson, Adair and Werner, directly or indirectly, offered and sold the securities of SGD in the form of investment contracts to one or more residents of the Western District of Washington and others.

Securities and Exchange Commission
1801 California St., Ste. 1500
Denver, CO 80202
(303) 844-1000

206.    IFFL, Brost, and Capstick were substantial participants in the sales of SGD securities.  They served as the brokers or dealers for the sales by SGD.  Investors were required to join IFFL before they were offered the securities of SGD.

207.    Sorenson was a substantial participant in the offer and sales of SGD securities because he owned and directed the activities of the SGD, he reviewed and edited the SGD offering materials, and personally met with prospective investors in Honduras and Canada.  In addition, he received directly or indirectly the benefit of the investors' funds.

208.    Adair was a substantial participant in the offer and sale of SGD securities because as the president of SGD he signed and approved the investment contracts with the various investors, accepted funds from investors on behalf of SGD into his attorney trust accounts, and personally met with prospective investors in Honduras and Canada.

209.    Werner was a substantial participant in the offer and sale of SGD securities after he became the president of SGD in April 2007, because he authorized the company to sell the securities and accepted funds from investors on behalf of SGD into his attorney trust accounts.

210.    No registration statement was filed or in effect with the SEC for the offers and sales of the securities of SGD made directly or indirectly by SGD, IFFL, Brost, Capstick, Sorenson, Adair and Werner.

211.    From approximately October 2001 through November 2004, IFFL, Brost and Capstick, directly or indirectly, offered and sold securities in the form of promissory notes of Quatro to one or more residents of the Western District of Washington and others.

212.    IFFL, Brost, and Capstick were substantial participants in the sales of Quatro securities.  They served as the brokers or dealers for the sales by Quatro.  Investors were required to join IFFL before they were offered the securities of Quatro.

213.    No registration statement was filed or in effect with the SEC for the offers and sales of the securities of Quatro made directly or indirectly by IFFL, Brost, and Capstick.

214.    Between December 2003 and November 2004, IFFL, Brost, Capstick and Regier, directly or indirectly, offered and sold the securities in the form of promissory notes of Rapid Express to one or more residents of the Western District of Washington and others.

215.    IFFL, Brost, and Capstick were substantial participants in the sales of Rapid Express securities.  They served as the brokers or dealers for the sales by Rapid Express. Investors were required to join IFFL before they were offered the securities of Rapid Express.

216.    Regier was a substantial participant in the offer and sale of the securities of Rapid Express, because he created the false offering materials used by Brost, and Capstick to offer and sell the securities of Rapid Express.

217.    No registration statement was filed or in effect for the offers and sales of the securities of Rapid Express made directly or indirectly by IFFL, Brost, Capstick, and Regier. Between July 2004, and December 2005, IFFL, Brost, and Capstick, directly and indirectly, offered and sold securities in the form of preferred shares of Arbour Energy to one or more residents of the Western District of Washington and others.

218.    IFFL, Brost, and Capstick were substantial participants in the sales of Arbour Energy securities. They served as the brokers or dealers for the sales by Arbour Energy. Investors were required to join IFFL before they were offered the securities of Arbour Energy.

219.    No registration statement was filed or in effect with the SEC for the offers and sales of the securities of Arbour Energy made directly or indirectly by IFFL, Brost, and Capstick.

220.    Between July 1, 2004 through August 24, 2005, IFFL, Brost, and Capstick, directly and indirectly, offered and sold the securities of Strategic Metals in the form of preferred shares to one or more resident of the Western District of Washington and others.

221.    IFFL, Brost, and Capstick were substantial participants in the sales of Strategic Metals securities.  They served as the brokers or dealers for the sales by Strategic Metals. Investors were required to join IFFL before they were offer the securities of Strategic Metals.

222.    No registration statement was filed or in effect with the SEC for the offers and sales of the securities of Strategic Metals made directly or indirectly by IFFL, Brost and Capstick.

223.    Between November 2002 and November 2007, Merendon Nevada, IFFL, Brost and Capstick, directly and indirectly, offered and sold securities of Merendon Nevada in the

form of investment contracts, and promissory notes to one or more residents of the Western District of Washington and others.

224.    IFFL, Brost, and Capstick were substantial participants in the sales of Merendon Nevada securities.  They served as the brokers or dealers for the sales by Merendon Nevada. Investors were required to join IFFL before they were offer the securities of Merendon Nevada.

225.    No registration statement was filed or in effect with the SEC for the offers and sales of the securities of Merendon Nevada made directly or indirectly by Merendon Nevada, IFFL, Brost and Capstick.

226.    In November 2007, Werner became the president, director, and controlling shareholder of Bearstone Capital Management Inc., which acted as the general partner in a limited partnership offering. Werner directly or indirectly offered and sold the securities of the limited partnership and received approximately $3 million from investors.

227.    No registration statement was filed or in effect with the SEC for the offers and sales of the securities of the limited partnership by Werner.

228.    The defendants directly or indirectly used the mails or means of instruments of transportation or communication in interstate commerce to offer and sell the securities listed above.

229.    As a result of these actions, each of the defendants, except for Merendon Int'l, violated the securities registration provisions of Section 5(a) and (c) of the Securities Act.

230.    SGD, IFFL, Merendon Nevada, Brost, Capstick, Sorenson, Adair, Werner and Regier acted in deliberate disregard of the regulatory requirement that they must file a registration statement before offering or selling securities to investors.

231.    SGD, IFFL, Merendon Nevada, Brost, Capstick, Sorenson, Adair, Werner and Regier were involved in a scheme to defraud investors as part of their offering of these various securities.

232.    The defendants' actions resulted in substantial losses to investors.

**IV.    IFFL, Brost and Capstick Acted As Unregistered Broker-Dealers In Violation of Section 15(a)(1) of the Exchange Act**

233.    IFFL was incorporated in Alberta, Canada on April 23, 2003.  Its head office was located in Calgary, Alberta.

234.    As described above, IFFL by means of the mails or the means or instrumentalities of interstate commerce effected trades in the securities of SGD, Quatro, Rapid Express, Arbour Energy, Strategic Metals, and Merendon Nevada for the accounts of investors, some of whom resided in the Western District of Washington or other locations in the United States.

235.    IFFL has never been registered as a broker or dealer with the SEC.

236.    Brost was the chief executive officer, a director, and president of IFFL at all times material to this Complaint.  He controlled its activities.

237.    As described above, Brost by means of the mails or the means or instrumentalities of interstate commerce effected trades in the securities of SGD, Quatro, Rapid Express, Arbour Energy, Strategic Metals, and Merendon Nevada for the accounts of investors, some of whom resided in the Western District of Washington or other locations in the United States.

238.    Brost has never been registered as a broker or dealer with the SEC or associated with a broker or dealer registered with the SEC.

239.    Beginning on or about December 2001, and as described above, Capstick by means of the mails or the means or instrumentalities of interstate commerce effected trades in the securities of SGD, Quatro, Rapid Express, Arbour Energy, Strategic Metals, and Merendon Nevada for the accounts of investors, some of whom resided in the Western District of Washington or other locations in the United States.

240.    Capstick has never been registered as a broker or dealer with the SEC or associated with a broker or dealer registered with the SEC.

241.    As a result of these actions, each of the defendants violated the broker-dealer registration provisions of Section 15(a)(1) of the Exchange Act.

242.     IFFL, Brost and Capstick acted in deliberate disregard of the regulatory requirement that they must register as brokers or dealers before effecting securities transactions for the accounts of others.

243.     As part of their violation they were involved in a scheme to defraud investors.

244.     The defendants' actions resulted in the substantial losses to investors.

## V.     Relief Defendants Received Part of the Ill-gotten Gains from the Scheme

245.     Laura Sorenson is the adult daughter of Sorenson.

246.     Between July 18, 2002 and December 4, 2006, Sorenson directed Adair to pay out of the funds received from investors at least $205,000 directly to Laura Sorenson.

247.     Between November 29, 2002 and December 13, 2002, Sorenson directed Adair to pay out of the funds received from investors approximately $95,600 to Tape Productions for the benefit of Laura Sorenson.

248.     On or about June 9, 2006, Sorenson directed Adair to pay out of the funds received from investors approximately $360,336 to Washington Mutual for the benefit of Laura Sorenson to pay off the mortgage on her home.

249.     On or about October 20, 2006, Sorenson directed Adair to pay out of the funds received from investors approximately $500,000 to Morningstar Films LLC for the benefit of Laura Sorenson.

250.     Thelma Sorenson is the wife of Sorenson.

251.     Sorenson directed Adair to pay out of the funds received from investors approximately $915,560 to Thelma Sorenson.

252.     Sorenson directed Adair to purchase out of the funds received from investors a watch and other jewelry for Thelma Sorenson valued at approximately $44,000.

### FIRST CLAIM FOR RELIEF
### Fraud – Violations of Exchange Act Section 10(b) and Rule 10b-5
### [15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5]

253.     The SEC repeats and realleges paragraphs above.

254.   Defendants Milowe Allen Brost, Gary Allen Sorenson, Larry Lee Adair, Ward K. Capstick, Bradley Dean Regier, Martin M. Werner, and the corporate defendants through which they acted, The Institute for Financial Learning Group of Companies, Inc., Merendon Mining Corp. Ltd., Syndicated Gold Depository, Inc., and Merendon Mining (Nevada) Inc., directly or indirectly, with scienter, in connection with the purchase or sale of securities, by the use of means or instrumentalities of interstate commerce, the mails, or any facility of a national securities exchange, employed devices, schemes, or artifices to defraud; made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon any person, in violation of Section 10(b) of the Exchange Act and Rule 10b-5.

255.   Defendants Milowe Allen Brost, Gary Allen Sorenson, Larry Lee Adair, Ward K. Capstick, Bradley Dean Regier, Martin M. Werner; and the corporate defendants through which they acted, The Institute for Financial Learning Group of Companies, Inc., Merendon Mining Corp. Ltd., Syndicated Gold Depository, Inc., which is now known as Bahama Resources Alliance Ltd. and Merendon Mining (Nevada) Inc. violated, and unless restrained and enjoined will in the future violate Section 10(b) of the Exchange Act and Rule 10b-5.

### SECOND CLAIM FOR RELIEF
**Fraud – Violations of Securities Act Section 17(a)**
[15 U.S.C. § 77q(a)]

256.   The SEC repeats and realleges paragraphs 1 through 204, and 245 through 252.

257.   Defendants Brost, Sorenson, Adair, Capstick, Regier, Werner, IFFL, SGD which is now known as Bahama Resources Alliance Ltd, Merendon Int'l, and Merendon Nevada, directly or indirectly, with the requisite scienter, in the offer or sale of securities, by use of the means or instruments of transportation or communication in interstate commerce or by use of the mails, employed a device, scheme, or artifice to defraud, obtained money or property by means of untrue statements of material fact or omissions to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made,

not misleading, or engaged in transactions, practices, or courses of business which operated or would operating as a fraud or deceit upon the purchasers of the securities.

258.     Defendants Brost, Sorenson, Adair, Capstick, Regier, Werner, IFFL, SGD which is now known as Bahama Resources Alliance Ltd., Merendon Int'l, and Merendon Nevada violated, and unless restrained and enjoined will in the future violate Section 17(a) of the Securities Act.

### THIRD CLAIM FOR RELIEF
### Aiding and Abetting Violations of Exchange Act Section 10(b) and Rule 10b-5
### [15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5]

259.     The SEC repeats and realleges paragraphs 1 through 204, and 245 through 252.

260.     In the alternative, the SEC alleges that Sorenson, Adair and Werner aided and abetted violations of Section 10(b) of the Exchange Act and Rule 10b-5.

261.     The SEC alleges above that Merendon Int'l IFFL, SGD, Merendon Nevada, Brost, Capstick and Regier committed primary violations of Section 10(b) of the Exchange Act and Rule 10b-5, by engaging in a scheme to defraud members of IFFL through the sale of securities of the selected group of companies including SGD and Merendon Nevada which are described above, made untrue statements or omissions of material facts and engaged in acts, transactions and courses of business that operated as a fraud or deceit on the IFFL members.

262.     As described above, Sorenson knowingly provided substantial assistance to each of the defendants listed in paragraph 251, and aided and abetted their violations of Section 10(b) of the Exchange Act and Rule 10b-5.

263.     Sorenson had a general awareness of his role in the violations.

264.     As described above Adair knowingly provided substantial assistance to each of the defendants listed in paragraph 251, and aided and abetted their violations of Section 10(b) of the Exchange Act and Rule 10b-5.

265.     Adair had a general awareness of his role in the violations.

Securities and Exchange Commission
1801 California St., Ste. 1500
Denver, CO 80202
(303) 844-1000

266.     As described above, Werner knowingly provided substantial assistance to each of the defendants listed in paragraph 251 and aided and abetted their violations of Section 10(b) of the Exchange Act and Rule 10b-5.

267.     Werner had a general awareness of his role in the violations.

268.     Defendants Sorenson, Adair, and Werner aided and abetted violations of Section 10(b) of the Exchange Act and Rule 10b-5, unless restrained and enjoined will in the future aid and abet violations of Section 10(b) of the Exchange Act and Rule 10b-5, and Section 17(a) of the Securities Act.

**FOURTH CLAIM FOR RELIEF**
**Offers and Sales of Unregistered Securities**
**Violations of Securities Act Sections 5(a) and 5(c)**
**[15 U.S.C. §§ 77e(a) and 77e(c)]**

269.     The SEC repeats and realleges paragraphs 205 through 232 above.

270.     Defendants Brost, Sorenson, Adair, Capstick, Regier, Werner, IFFL, SGD which is now known as Bahama Resources Alliance Ltd, and Merendon Nevada, directly or indirectly, have made use of the means or instruments of transportation or communication in interstate commerce or of the mails to sell securities, when no registration statement was in effect with the Commission as to such securities, and have made use of the means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell such securities when no registration statement had been filed with the Commission as to such securities.

271.     There were no applicable exemptions from registration.

272.     Defendants Brost, Sorenson, Adair, Capstick, Regier, Werner, IFFL, SGD which is now known as Bahama Resources Alliance Ltd, and Merendon Nevada therefore violated, and unless restrained and enjoined will in the future violate Sections 5(a) and 5(c) of the Securities Act.

**FIFTH CLAIM FOR RELIEF**
**Offers and Sales of Securities by an Unregistered Broker-Dealer**
**Violations of Exchange Act Section 15(a)**
**[15 U.S.C. § 78o(a)]**

273.     The SEC repeats and realleges paragraphs 233 through 244 above.

274.     Defendants IFFL, Brost and Capstick, while engaged in the business of effecting transactions in securities for the account of others, made use of the mails or the means or instrumentalities of interstate commerce to effect transactions in, or to induce or attempt to induce the purchase or sale of, a security without being registered in accordance with Section 15(a) of the Exchange Act.

275.     Defendant IFFL, Brost and Capstick violated, and unless restrained and enjoined will in the future violate Section 15(a) of the Exchange Act.

## PRAYER FOR RELIEF

The SEC respectfully requests that this Court:

## I.

Find that Defendants Brost, Sorenson, Adair, Capstick, Regier, Werner, IFFL, Merendon Int'l, SGD, and Merendon Nevada committed the violations alleged in this complaint, and unless restrained will continue to do so.

## II.

Enter a permanent injunction, pursuant to Rule 65(d) of the Federal Rules of Civil Procedure, enjoining all Defendants from violating, directly or indirectly, each of the provisions of the law and rules alleged in this Complaint.

## III.

Order each of the Defendants to prepare an accounting of all the proceeds they obtained from the unlawful transactions and activities described above.

## IV.

Order each of the Defendants to disgorge all ill-gotten gains resulting from their participation in the conduct alleged in this Complaint, together with pre-judgment and post judgment interest.

## V.

Order each of the Defendants to pay civil penalties pursuant to pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)] in an amount to be determined by the Court.

**VI.**

Order that Defendants Brost, Sorenson, Adair, Capstick, Regier, and Werner are barred from acting as an officer or director of any issuer that has a class of securities registered pursuant to Section 12 of the Exchange Act or that is required to file reports pursuant to Section 15(d) of the Exchange Act, pursuant to Section 20(e) of the Securities Act [15 U.S.C. § 77t(e)] and Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)] and the Court's equitable powers.

**VII**.

Order Relief Defendants Thelma Sorenson and Laura Sorenson to prepare an accounting of all proceeds received directly or indirectly from one or more defendants and to disgorge all ill-gotten gains received directly or indirectly in the form of any benefits of any kind derived from the illegal conduct alleged in this Complaint.

**VIII.**

Grant such other relief as this Court deems necessary and appropriate.


DATED: June 10, 2010.

Respectfullly submitted,


s/ Leslie J. Hughes
Leslie J. Hughes, Colo. Bar No. 15043
Polly A. Atkinson, Colo. Bar No. 18703
Attorneys for Plaintiff
Securities and Exchange Commission
1801 California Street, Suite 1500
Denver, CO  80202
Telephone (303) 844-1000
Fax (303) 844-1068
Email: HughesLJ@sec.gov
Email: AtkinsonP@sec.gov